SOLOMON FROST AND JAMES MURPHY v. THE MILWAUKEE & NORTHERN RAILROAD COMPANY.

*Railroad companies—Accident at crossing—Gross negligence—Contributory negligence.*

1. The mere fact that an engineer, at a distance of a mile or a mile and a quarter from a private crossing, sees a load of logs, to which horses are attached, standing on the track at the crossing, is not sufficient to warn him that the load is fast upon the track, and that the horses are unable to move it, and he is not called upon to check the speed of his train until signaled, or until near enough the crossing to see the danger for himself.

2. In order to convict a railroad company of willful and reckless conduct, or of gross negligence, in running a freight train into a load of logs, to which horses are attached, and which has become stalled on a private crossing, it must be shown that the engineer knew the situation at the crossing in ample time to stop his train, and that he ran on in spite of such knowledge, knowing the consequences which must ensue if he failed to stop the train before reaching the obstruction.

3. Where, in such a case, the servants in charge of the logs and

team see the smoke of the approaching engine while at a distance of a mile or a mile and a quarter from the crossing, and after they have abandoned their attempt to draw the logs off the track, and are preparing to unload them, it is their duty at once to unhitch the horses, and signal the approaching train.

Error to Menominee. (Stone, J.). Argued June 27, 1893. Decided July 25, 1893.

Negligence case. Defendant brings error. Reversed. The facts are stated in the opinion.

*B. J. Brown,* for appellant.

*Sawyer & Waite* (*R. C. Flannigan,* of counsel), for plaintiffs.

GRANT, J. Plaintiffs were lumbermen, and at the time of the accident complained of they had several teams hauling logs from the east across the defendant's track to the Michigamme river. The crossing was constructed by the defendant in the usual manner, for the sole convenience of the plaintiffs, and was known as the "Frost & Murphy Crossing." Plaintiffs kept three or four men upon their logging road to keep it covered with snow, and, as the witnesses expressed it, "in good slipping condition." On the 14th day of February, 1890, Gould, one of plaintiff's teamsters, with a team of four horses and a load of logs, attempted to cross the track. It was a warm day, and the snow had softened so that the runners went through, and stuck, either upon the iron rails or the timbers of the crossing, or both. The horses were unable to pull the load off. Other teams of the plaintiffs were behind this one. First one span of horses was brought from the rear team, but the three teams could not pull it off. A fourth span was then brought, but the four could not move it. The reason why the eight horses could not pull the load off is.

stated by the plaintiffs, in their brief, to be: "The horses were unmanageable, and could not be made to pull together." Four of plaintiffs' employés were present at the crossing. Being unable to pull it across, they then concluded to unload some of the logs, and draw them from the track. For this purpose the teamster told one of the others, named Carey, to take his team around across the track, to get ready to draw the logs off as they were unloaded. Just as the teamster got on the load, he saw the smoke of the approaching train, which was coming around a curve. Carey testified:

"Gould started to flag first, and then some of us fellows said it was too soon to flag; he had better throw off the logs; they couldn't see him through the smoke; and he threw off the logs, and when the train came in sight he flagged them again. * * * Between the time I saw the smoke and the time that I saw the train, I took my team off, and got them around between the road to the south side of the load. It was kind of a hard place. It took me a little time. When I saw the smoke, my team was ahead of his. After I saw the smoke, I went and unhitched my team. I took them around to the east side of the track. Then I took the chain off, and went in back behind the load, to put it on the log he rolled down. When I unhitched it, his team was right over the track, and mine was right ahead a little; I should think it was a rod. In going to the east side of the track, I went to the north side of the load."

Gould loosened the chain, and got one log off, but Carey had not time to draw it off the track. The teamster, who was upon the load, then waved his coat with one hand, and his hat with the other, as a signal to the train. The train, however, did not stop. As it neared the crossing the teamster jumped from his load, and tried to unhitch the horses; but the traces were taut, and he had not time to unhook them before the train struck the load, killing two of the horses, and destroying the harnesses and sleigh. When asked how long it took to unhook a span of horses

from the sleigh, he replied, "I can do it as quick as you can say it."

Plaintiffs rely upon the gross negligence of the defendant's engineer in not keeping a proper lookout, so that he might have seen the obstruction and signals given by the teamster in time to avoid the accident.

The train was coming from the north. It consisted of 19 cars, 14 of which were loaded with stone and ore, weighing from 25 to 30 tons each. 2,700 feet north is a cut about 500 feet long. North of this cut, and between one mile and one mile and a quarter from the Frost & Murphy crossing, is another crossing, known as the "Schwartz Crossing." A short distance north of the Schwartz crossing, the railroad curves. The train was going at from 20 to 24 miles an hour, and was running under orders, a little ahead of time. From about the center of the cut to the Frost & Murphy crossing is a slight down grade. Only two witnesses who saw the accident, Gould and Carey, were sworn in behalf of the plaintiffs. They both testify that no signal was given by the teamster until the train was within a half to three-quarters of a mile of the crossing, and that the load was upon the track for 20 to 25 minutes before it was struck by the engine. Gould testified that in his opinion the train was about three-quarters of a mile distant when he waved his coat and hat; and Carey, that it was from a half to three-quarters of a mile.

The defendant's engineer testified that when he came into the deep cut he saw an obstruction on the track, but supposed it was a hand car; that he did not see the object until he was in the cut, and could not see it before. He was an old engineer, but this was his second trip over this road, and he was not accustomed to seeing loads of logs. He said it may have been five seconds from the time he first saw the object till he whistled for brakes;

that he whistled before he saw what the object was.    He
further testified:

> "I endeavored to reverse the engine.    The first time
> and the second time, it slid.    As a man of 18 years'
> experience, I did not want to see her slide, and I reversed
> her back again, and as soon as she caught—And she slid
> again, and I reversed her ahead; and, the third time I
> pulled her back, I left her there.    By that time, it did
> not take long to get down to the logs; and the third time
> I had her reversed, I guess, I was looking out for my
> own life."

He jumped from the engine when seven or eight car-
lengths from the logs.    One of the brakemen was in the
cab at the time, and corroborates the testimony of the
engineer.    He immediately ran back over the cars, and set
five brakes.    Seeing that a collision was inevitable, he also
jumped from the train.    The cars were properly equipped,
and supplied with the usual number of brakemen.

In rebuttal a witness named BeDell was produced by
plaintiffs, who had been a fireman, engineer, brakeman,
conductor, and trainmaster on railroads.    He testified that
with a good, clean rail,—meaning a rail that is not wet
or dampened by fog,—and with proper assistance from the
engineer, without any brakeman, and with a good brake
on the caboose, he should judge they ought to stop a train
of 20 loaded cars, going at the rate of 18 or 20 miles an
hour, with a vacuum brake on the engine, in from 1,200
to 1,500 feet, and that, in a down grade of three-tenths
of a foot in 100 feet, it was his judgment that they could
stop such a train in from 2,000 to 2,500 feet.    He further
said that it depended somewhat upon circumstances, and
that he was basing his answers upon the supposition of a
nice, warm day in winter, with the track as it should be
upon that kind of a day; that he had heard the testimony
on the part of the defendant, and made his answers in
view of those conditions.    On cross-examination he testi-

fied that he left railroading 10 years before; that he could not say whether ever in his experience he had stopped a train of equal weight, on level ground, running 18 or 20 miles an hour, in 1,500 feet, but he believed it could be done. He, however, said that it was a mere matter of opinion.

The court, in its instructions to the jury, said:

"It is claimed by plaintiffs that the employés of the defendant in charge of the train negligently, recklessly, willfully, and wantonly ran the same without keeping a proper lookout ahead, and without keeping a brakeman upon the cars, and without keeping said train under control, in view of danger. It is further claimed by plaintiffs that defendant's employés saw the said sleigh and horses on said crossing, and saw and understood the signals of the plaintiffs, in time to have stopped the same before it struck said sleigh and team, yet that the defendant did not stop, or attempt to stop, said train, but carelessly, negligently, willfully, wantonly, and recklessly ran the same into and upon said horses and said sleigh, thereby destroying them; and this is the negligence submitted to you."

In regard to the contributory negligence of the plaintiffs, the court used the following language:

"The court further advises you that it cannot be considered to be contributory negligence that the plaintiffs have merely not anticipated the defendant's negligence, for the plaintiffs have a right to presume that the defendant is going to act with ordinary care until they have some notice to the contrary, when it becomes their duty to take ordinary means to avoid it; that is, such means as a prudent person ought to take."

He further instructed them that there was no evidence of reckless conduct on the part of the servants of the defendant after the whistling or signal was given for brakes, but left it to the jury to determine whether the defendant was guilty of gross negligence and reckless conduct in not giving the signal as soon as it should have been given.

There is but little discrepancy as to the facts in this case, except it may be upon the question when the engineer whistled for brakes. Gould gave no evidence on this point upon his direct examination. On his cross-examination he testified that he heard a whistle,—one whistle, and a few sharp whistles afterwards,—and that the engineer and fireman jumped from the train "very shortly afterwards." He thought the engine was from 10 to 15 rods distant when they jumped. Carey testified, on direct examination, that the train was in his sight when it whistled. On cross-examination he said he was not in position to see the train when he heard the sharp whistle, but he imagined it was about 20 rods distant. This is all the evidence given by the plaintiffs to show how far the train was from the crossing when the signal for brakes was given.

We do not think, under this record, that the verdict and judgment can be sustained. There is no evidence on which to base a finding of willful, wanton, and reckless conduct on the part of the employés of the defendant. There is no evidence that the engineer did not use every effort to stop the train as soon as he saw the danger. Plaintiffs gave no warning until the train was within a half or three-quarters of a mile. Could he, at the distance of a mile or a mile and a quarter, have seen the load of logs across the track, with the horses attached, there was nothing in this fact to warn him that they were fast upon the track, and unable to move. The engineer was not called upon to check the speed of his train until he was signaled, or was near enough to see the danger himself.

The learned counsel for the plaintiffs, in their brief, say:

"The defendant was guilty of gross negligence, because, with a proper lookout, the engineer should have seen the obstruction on the track in ample time to have stopped the train. If they saw the obstruction before they reached the

cut, then the inference is irresistible that they ran on with a reckless disregard of consequences."

This might be true of trees blown across the track, or a slide of earth and stones from a hill or embankment upon it, of sufficient size to show the nature and character of the obstruction and the apparent danger. According to this contention, if an engineer sees a team standing upon a private crossing, from a half a mile to a mile distant, he must assume that the team is fast and unable to move, and at once proceed to stop his train. Such is not the law. In order to convict the defendant of willful and reckless conduct, or of gross negligence, it must certainly have been shown by the plaintiffs that the engineer knew the situation at the crossing in ample time to stop his train, and that he ran on in spite of that knowledge, and knowing the consequences that must result if he failed to stop. *Denman v. Johnston,* 85 Mich. 396. " Gross negligence," in this class of cases, is there defined as follows:

" The term ' gross negligence ' has been used in cases decided by this Court, and has a definite meaning, when referred to, as authorizing a recovery for a negligent injury notwithstanding the contributory negligence of the plaintiff. It means an intentional failure to perform a manifest duty, in reckless disregard of the consequences as affecting the life or property of another. It also implies a thoughtless disregard of consequences, without the exertion of any effort to avoid them."

It does not appear whether plaintiffs' employés knew that a train was about due. But this is of no consequence. All persons crossing railroads are chargeable with knowledge that trains may come at any time. Plaintiffs' witnesses testified that they did not remove their horses from the load after they found they could not haul it off the track, nor send any one up or down the track to signal any trains that might come, because they supposed they would have no difficulty in signaling a train from that

point in time to stop it. For the like reason, the teamster, who was on the load, waited to loosen the chain and roll off a log before he considered it necessary to wave his hat and coat as a signal of danger. The law does not justify persons in taking such risks. Plaintiffs had employés present who could have been sent either way in ample time to have avoided the accident.

The only evidence to show that the engineer and brakeman did not make every reasonable effort to stop the train is that of Mr. BeDell. His testimony is not sufficient basis for a finding of gross negligence. The learned circuit judge said that the train was running from 20 to 24 miles an hour, and such was the testimony. The opinion of the witness was not, therefore, based upon the evidence in the case. It is contrary to good sense to say that gross negligence may be based upon such an opinion. Carey's testimony as to the position of the train when he first heard a whistle is utterly worthless, for he was not in position to see it, and does not pretend that he saw it. Gould's testimony likewise fails to give any definite information as to the distance. Assuming that the whistle he heard was the first one, does the statement that they jumped from the train "very shortly afterwards," give any definite idea as to the distance or time? The whole thing happened in a very short time. Such testimony is not evidence of negligence; much less, of gross negligence or willful misconduct. It is significant, also, that Gould does not testify that only one whistle was blown, or that he heard but one. His testimony is not, therefore, necessarily in conflict with that of the engineer.

The instruction as to contributory negligence said, in substance, to the jury, that no duty devolved upon plaintiffs' servants, other than to attempt to remove the load from the track, until they saw the approaching train, and that it was not then their duty to unhitch their horses,

which could have been done in a moment. This instruction was erroneous. It was the clear duty of the plaintiffs' servants to unhitch the horses after they had abandoned the attempt to draw the load off the track, and saw the smoke of the approaching train. Had this been done, no substantial injury would have resulted, except that which the defendant received.

Judgment reversed, and new trial ordered.

HOOKER, C. J., and LONG, J., concurred with GRANT, J.

McGRATH and MONTGOMERY, JJ., concurred in the result.