GURRIE v. NEW YORK & NORTH SHORE TRACTION CO.

(Supreme Court, Appellate Division, Second Department. May 24, 1912.)

1. STREET RAILROADS (§ 81*)—OPERATION—CONTROL OF CAR.

It is not negligence for the motorman of a suburban street railway company, whose tracks lie on a highway on which there are no intersecting roads for more than a mile, and on which there is only one house, not to have his car under that control which is demanded in populous districts with numerous intervening streets.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 172–177; Dec. Dig. § 81.*]

2. STREET RAILROADS (§ 114*)—OPERATION—INJURIES TO PERSONS ON TRACKS—NEGLIGENCE.

In an action by the administratrix of one killed on the tracks of a suburban street railway line, evidence *held* insufficient to show negligence on the part of the traction company.

[Ed. Note.—For other cases, see Street Railroads, Cent. Dig. §§ 239–250; Dec. Dig. § 114.*]

Appeal from Trial Term, Nassau County.

Action by Julia Gurrie, as administratrix of the estate of Michael Gurrie, deceased, against the New York & North Shore Traction Company. From a judgment for plaintiff and an order denying its motion for new trial, defendant appeals. Reversed and remanded.

Argued before JENKS, P. J., and BURR, THOMAS, CARR, and WOODWARD, JJ.

James A. MacElhinny, of New York City, for appellant.

George F. Hickey, of New York City (M. P. O'Connor, on the brief), for respondent.

WOODWARD, J. [1, 2] On the 27th day of October, 1910, at about 7:10 p. m., the plaintiff's intestate was driving a team attached to a heavy load of lumber on the North Hempstead Turnpike between Great Neck Road and Little Neck Road, near Manhasset, Nassau county. The defendant operated an electric surface railroad upon the highway, and at this particular point the tracks were placed at the south side of the highway, which was about 60 feet in width. The roadway is macadamized for a space of about 18 feet in the center, and between the macadam and the first rail of the defendant's railroad there was a dirt apron about 4 or 5 feet wide. Between Great Neck Road and Little Neck Road is a distance of one mile, and in that distance there is no street or highway crossing North Hempstead Highway, and on the south side of the roadway there is not a single house, and but one on the northern side. The night of the accident was very dark, and it was raining a fine rain, and at the time of the accident there were no street lights burning in that locality. Michael Gurrie, plaintiff's intestate, as we mentioned, was driving a team on this highway heavily laden with lumber, and he was accompanied by one David Levi, who was likewise driving a team, with the same burden. These teams were en route from Brooklyn to Roslyn, going east, and neither of them was provided with a lantern. Plaintiff's intestate

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was accustomed to driving over this highway and knew the road.. The turnpike, going east from the city line, is upgrade to the point of the accident, and continues upgrade to the top of the first hill beyond the point of the accident, a distance stated by the appellant to be 375 feet, and by the respondent to be 478.40. From the brow of the hill the highway drops down for a space of about 700 feet, at which point it is something over 15 feet below the top of the first hill, and it then rises for a distance of about 900 feet to an altitude of something over 52 feet.

Gurrie, on the night in question, had driven his team off from the macadam, across the dirt wing, and had one of the wheels of his wagon over the northern rail of defendant's track, when he stopped to rest his team. When he tried to start, he discovered that his wheel was in a rut and obstructed by the rail, and the team was unable to move the load. Levi, discovering his position, came up to advise and help, and finally drove his own team from the rear of Gurrie's wagon to a position in front, where he attached a rope to Gurrie's wagon and attempted to draw the load out, but without avail. At this stage one Dietz came along with another team, supplied with a lantern, and finding the plaintiff's intestate in trouble, took hold and attempted to assist. Gurrie's wagon had been in this position for about half an hour, and while they were at work in an effort to extricate him, Dietz saw the defendant's car coming from the east on top of the second hill, about three-quarters of a mile away. The car stopped at Great Neck Road, about half a mile away, and then came on toward the scene of the accident. Dietz told the men that the car was coming and to get the mules out of the way. Levi saw the car at the same time. Dietz said, "Some one better go town and stop her." Levi shouted to Gurrie that the trolley was coming; get them loose. Gurrie responded that he could not get the rope loose; it was too tight. At that time the car had not come over the nearest hill, less than 500 feet away. They could see the light of the car as it went down into the valley and came up the nearest hill. Obviously the defendant's motorman had no reason to anticipate this situation. The improved part of the highway was four to six feet from the track which he was using, there were no cross-roads, or roads running into the highway between the two main roads above referred to, and only one house in a distance of one mile. Under such circumstances, he was not bound to have his car under that control which is demanded in populous districts, with intervening streets at short intervals, and the practical operation of suburban lines, the demand for rapid transit, all warrant the operation of cars under these conditions at a high rate of speed.

With the plaintiff's intestate and the other two men at work to get the wagon free from its position right down to the time when the defendant's car came over the hill, less than 500 feet away, neither Gurrie nor any one of the men appears to have made a move to give the defendant any notice of their situation, and it appears from the record that there was a slight curve just as the car came over the hill, so that the lights, which illuminated the tracks for a distance of 200 or 300 feet ahead, would not follow the tracks until the car had been brought

around to the straight line. After this car was in sight for the second time, and less than 500 feet away, with a downgrade in front of it, Dietz appears to have run toward the car, swinging a lantern, and he says he had reached a point 25 to 50 feet from the front wagon, which was fastened to the second by a rope and standing at nearly right angles to the track, when the car passed him, and a moment later collided with the rear wheel of the front wagon and then passed on a few feet, where it hit the mules, killing one of them, and came to a stop without any serious injury to the car, and without in any manner injuring any of the passengers, or, so far as appears, jarring them to any great extent. Certainly, if this car was running at the rate of 30 miles per hour, and had not slackened its speed at all at a distance of 50 feet from the first wagon, it could hardly have been stopped in the short distance remaining, without more serious results than the testimony discloses. The wagons were not tipped over, nor, with the exception of the crushing of the wheel of the first wagon, does there appear to have been any serious damage to either of them.

If the car was being operated at 30 miles per hour, and it seems improbable that it was, the time that it would take to traverse a distance of 500 feet was not a long time to give notice of the situation to the defendant. The fact that Dietz ran a distance of 50 feet, swinging a lantern (and this is probably twice the distance he actually ran, for he places it from 25 to 50 feet), was not notice to the defendant that the plaintiff's intestate, with his team, was fastened in the tracks. The night was dark and rainy. The glare of his headlights and the watching of his slippery tracks would naturally confine his vision to the space illuminated by his headlights, and he might not see an ordinary hand lantern at the first moment that it was displayed, or be able to comprehend its meaning on the instant. The first and most natural impulse would be to accept it merely as a signal to stop to take on a passenger, or it might be easily understood that he might properly regard it merely as some one passing along the highway, and, until the demonstration became visible and obviously intended to convey a warning of danger, he would not be negligent in not applying his brakes and making an effort to stop. The undisputed evidence is that, as soon as the motorman saw and comprehended the warning, he applied his brakes and make every effort to stop, but the car was running on a downgrade, on a wet, slippery track, and, as we read the record, there was no evidence that this car would, under the circumstances, have been stopped within the distance that must have intervened after the warning was given. The car weighed 24 tons, and even if running only at eight or nine miles an hour upon a downgrade, upon a wet track, would be very difficult to stop in a short space, and if every traction car traversing a suburban highway on a dark night was to be stopped every time a lantern appeared in the highway, there would be more complaint than at present about the delays in transportation. We fail to discover the negligence of the defendant.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event. All concur.