VOUGHT v. MICHIGAN UNITED TRACTION CO.

1. STREET RAILWAYS—NEGLIGENCE—CONTRIBUTORY NEGLIGENCE.
   Where plaintiff's traction engine while stalled upon defend-
   ant's track at night, at a farm crossing near a regular
   stopping place for local cars, was struck and damaged
   by defendant's limited car, which plaintiff, after several
   minutes' delay, attempted to flag with a white light, and
   the evidence showed that plaintiff failed to comply with
   the provisions of Act No. 145, Pub. Acts 1887, as amended
   (1 Comp. Laws 1915, § 4793), requiring steam traction
   engines to carry and use planks at crossings and carry a
   red light at night, and plaintiff admitted that the accident
   would not have happened if he had used planks, and
   defendant's evidence showed that the motorman had orders
   to stop for a red light but to pay no attention to a white
   light, plaintiff was guilty of contributory negligence pre-
   cluding recovery, irrespective of defendant's negligence.

2. SAME—NEGLIGENCE—GROSS NEGLIGENCE.
   Where defendant's motorman on a limited car was running
   at the regular rate of speed, on scheduled time, kept the
   customary lookout, and gave the regular signals for cross-
   ings, but failed to stop at a signal by a white light near a
   regular stopping place for local cars, which he thought
   was given by some one wanting to take a local car, and
   in consequence a collision with plaintiff's traction engine,
   which was stalled on the track, occurred, he was not
   guilty of gross, wanton, or wilful, negligence amounting
   to an intentional failure to perform a manifest duty, en-
   titling plaintiff to recover, in an action for damages. KUHN
   and BIRD, JJ., dissenting.

Error to Calhoun; North, J. Submitted October
24, 1916. (Docket No. 104.) Decided December 22,
1916.

Case by A. Barrett Vought against the Michigan
United Traction Company for damages to a traction
engine. Judgment for defendant on a directed ver-
dict. Plaintiff brings error. Affirmed.

*Albert C. Kingman* and *Burritt Hamilton,* for appellant.

*Sanford W. Ladd* (*Charles E. Lewis* and *Warren, Cady, Ladd & Hill,* of counsel), for appellee.

STEERE, J. Plaintiff, a resident of Bedford township, Calhoun county, owned a steam traction engine, used in connection with his business of threshing grain, baling hay and straw, filling silos, etc. Defendant owns and operates an electric interurban railway line, a portion of which passes through Bedford township along the east and west highway between the village of Augusta and the city of Battle Creek, in said county.

On the afternoon of September 21, 1914, plaintiff was engaged in baling straw at the "Powers farm," in Bedford township, located something less than three miles west of Battle Creek, lying north of the highway along the northerly side of which defendant's track ran. When he attempted to drive his traction engine out into the highway over the Powers farm crossing that evening, it became stalled upon the railway track and was demolished by one of defendant's limited cars which came upon it from the west. He brought this action to recover for the damage thus done his engine, charging that defendant "wantonly, wilfully, and negligently" caused it. At the trial a verdict was directed for defendant on the ground that it conclusively appeared plaintiff's own negligence caused or contributed to the accident.

The undisputed testimony shows that at about noon on the day in question plaintiff went to Powers' farm with his traction engine to bale some straw and drove it over defendant's track at the farm crossing without difficulty. He completed the baling that evening at about 6:30, and after supper started to leave, some time between 7:30 and 8 o'clock, with his engine hauling a silo filler which he had sent for during the after-

noon. It was then after nightfall and very dark. On approaching defendant's track he looked and listened, and after ascertaining no car was within sight or hearing he proceeded to drive across to the portion of the highway traveled by vehicles. The front wheels passed over both rails of the track safely, but the rear wheels slipped and the engine stalled. He tried unsuccessfully to go ahead and to back, but some portion of the machinery broke down and left the engine powerless to move, standing with the forward wheels on the south side of the south rail and the rear wheels on the north side of the north rail. Plaintiff had three men with him, but did nothing to guard against an approaching car until one was heard coming from the west, variously stated by plaintiff and his witnesses at from two or three to five minutes after the engine was stalled and discovered to be broken down. He then directed one of his men, named Van Fleet, to go down the track with a lantern and flag the car. Van Fleet started at once, running down the track swinging his lantern, but the car was not checked until the motorman saw the obstruction on the track ahead and too late to avoid the accident. Van Fleet testified of the intervening time:

"Before I started we had been on the track two or three minutes. I couldn't tell anything about whether it might be four or five minutes. We were trying to get the engine off up to that time. We had given it up and had decided it was broken down and was stuck."

Plaintiff stated:

"I see right away that I couldn't get it off, so I unhitched the silo filler in order to get that out of the way."

The following facts are shown by plaintiff's own testimony, either on direct or cross-examination: This farm crossing was not planked, and the rails were

about four inches above the ground. He carried no planks, but, had he done so and used them, he could have crossed without any trouble. He had a white lantern but carried no red light. He was familiar with the surroundings, and knew limited cars passed over the track each day about every two hours and local cars about every two hours. That a limited car would not stop for a signal at a local stop. That a white light was the customary way of signaling local cars for a local stop. That "Stringham's road," which connected with the road upon which the track ran (less than 300 feet west of the Powers' farm crossing), was a regular stop for local cars only. That he was familiar with the operation of the interurban electric railway along there, and thought there were 15 or 16 cars going over that track in each direction each day. That he knew a car was liable to come along any time and limited cars would not stop there, and, although he knew for two or three minutes before he heard the car that he was stuck on the track, he did nothing during that time to try to stop any car which might be approaching.

A witness of plaintiff named Miller, who was working for and with him that evening, estimated that from the time the engine was stalled until the accident was eight minutes. Mrs. French, a witness for plaintiff, who lived with her husband at Stringham's Corners, testified that she heard and saw the engine stalled on the track at Powers' farm crossing, and, knowing the limited was due, called her husband, who had retired; that she thought about five minutes intervened before Van Fleet started down the track with a white lantern, and as he passed she called to him from her porch that they would not stop a limited car for a white lantern. Mr. French, called also by plaintiff, testified that when his wife first told him of the engine being stalled on the track and the limited due he did

not get up, but pretty soon she came back saying, "The limited is coming, and they are going down the track with a white lantern, and they won't stop," when he arose and went out on the porch with her and saw the car coming and the man with the lantern running down the track; that he had gone about seven rods from the traction engine when it was struck. Under the circumstances disclosed the testimony of plaintiff and his witnesses indicates not only unreasonable delay, but an improper method in attempting to warn an approaching car of the danger.

Act No. 145, Pub. Acts 1887, amended by Act No. 71, Pub. Acts 1903 (2 How. Stat. [2d Ed.] § 4235; 1 Comp. Laws 1915, § 4793), provides, so far as material here:

"It shall be unlawful for any person * * * owning or controlling any carriage, vehicle, traction or other engine propelled by steam, by themselves, their servant, agent or employee, * * * to permit or use the same to pass over, through or upon any public highway, road or street, unless such owner, * * * shall send before the same a person of mature age, at least ten rods and not more than 40 rods in advance, * * * and at night such person shall carry a red light; and such persons shall carry and use planks sufficient to plank all crosswalks," etc.

A violation of any of the provisions of this act is made a misdemeanor punishable by fine or imprisonment, or both, in the discretion of the court. It seems clear that, had plaintiff complied with this act, or exercised a reasonable degree of care and caution after his engine was stalled, this accident could not have occurred. That he was guilty of continuing negligence which caused or contributed to the accident is conclusively shown by his own testimony. *Good Roads Construction Co.* v. *Railway Co.*, 173 Mich. 1 (138 N. W. 320).

Plaintiff himself testifies that, had he equipped him-

self with planks as the statute required, and used them, the accident would not have happened. That the use of a red light which the statute required him to carry at night would have prevented the accident is shown by the undisputed testimony of the motorman that his instructions were to stop for a red light, and, had there been a red light exposed instead of a white light, he would have put on the emergency brake and stopped his car back where he first saw the light, the rules being that limited cars do not make local stops, and "if he (Van Fleet) had got in between stops, I would have known something was wrong and slacked up." It was a dark night, and the stalled traction engine was allowed to stand in the darkness across defendant's track with no attempt before the accident to light or illuminate it, and after a car was heard Van Fleet was sent to "flag it," but in the attempt he went to and a short distance beyond a local stopping place, as it happened, and tried to flag, with the customary signal for a local stop, an approaching limited car, which did not make local stops and was only author- ized to stop there for a red light, the customary and well-known danger signal. Not only was plaintiff's negligence continuing, but it was a concurrent, proxi- mate, and contributing cause of the accident. It was shown the car was running over 50 miles an hour, and it is urged in plaintiff's brief that:

"Such reckless conduct in operating a car upon a public highway was gross and reckless negligence on the part of defendant, and the jury would have been justified in so finding."

Whether defendant was negligent in running its car at the shown rate of speed, at the particular time and place, might properly be a question for the jury in case plaintiff was not shown to be guilty of contribu- tory negligence precluding a recovery, irrespective of defendant's negligence.

In *Rouse* v. *Railways Co.*, 158 Mich. 109 (122 N. W. 532), it was held that one injured when driving across the tracks of a street car line by an on-coming car could not recover when he was himself guilty of contributory negligence, although the car might have been running at an excessive rate of speed prohibited by a city ordinance.

In *Nissly* v. *Railway Co.*, 168 Mich. 676 (131 N. W. 145, 135 N. W. 268, Am. & Eng. Ann. Cas. 1915C, 719), this subject is discussed in part as follows:

"We cannot lose sight of the public convenience, and its desire for rapid transit, with the inducement to run these cars at a much higher speed than 30 miles an hour. They are in competition with steam roads, which run faster than that. Where they run in the highways, which are also used by other vehicles, the circumstances of such use are to be considered. The legislature has power to control and regulate speed, and may require adequate protection. Until this power is exercised, we can recognize only the rule that the rate is unlimited, except by the general rule that it must be reasonable under all the circumstances"—citing cases.

Under the testimony in that case the negligence of each party was a question for the jury, but it was held that, if the animal killed by defendant's car for the value of which the action was brought got upon the track by reason of plaintiff's negligence, he should not have had a verdict, because of his contributory negligence.

We find nothing in the testimony to sustain plaintiff's contention that the motorman was guilty of gross, wanton, or wilful negligence in the operation of his car. He had ten years' experience in that employment, and was in charge as a motorman of a limited car on a fast run between Kalamazoo and Battle Creek, practically on time and running at the regular rate of speed, scheduled to leave Kalamazoo at 7:10 and

arrive at Battle Creek at 8:05. He kept the customary lookout and gave the regular signals for crossings; he saw Van Fleet's signals at or near Stringham's Corners, and states:

"I thought it was somebody wanting to take a local car, trying to stop a limited with a white light."

A witness named Pallister, who was in front of his house about six or seven rods east of the Powers farm crossing and looking to the west past the stalled engine towards the approaching car, stated that he thought the same thing, did not then see the stalled engine or anything on the track, and there was no other light to be seen except the white one waved by a man who ran out, and wondered "what fool was trying to stop a limited car" until it came around a curve and he saw the traction engine when the headlight shone upon it. It was shown there was a slight curve in the track to the west of the traction engine which threw the rays of the headlight of the car to one side for a time. The signal as given actually served to divert attention and mislead rather than to warn. The motorman testified that the first intimation to him of anything on the track was when he saw the white steam of the traction engine, and then he immediately threw on the emergency brake, making every possible effort to stop the car before reaching it. Of a lantern signal given under somewhat similar circumstances it was said in *Gurrie* v. *Traction Co.*, 151 App. Div. 57 (135 N. Y. Supp. 833):

"The fact that Dietz ran a distance of 50 feet, swinging a lantern  *  *  *  was not notice to the defendant that the plaintiff's intestate, with his team, was fastened in the tracks.  *  *  *  The first and most natural impulse would be to accept it merely as a signal to stop and take on a passenger.  *  *  *  If every traction car traversing a suburban highway on a dark night was to be stopped every time a lantern appeared

in the highway, there would be more complaint than at present about the delays in transportation."

In *Frost* v. *Railroad Co.*, 96 Mich. 470 (56 N. W. 19), where it was shown that in the daytime the engineer of a freight train ran it into a load of logs stalled on the tracks with horses attached, at a private crossing, the court held that there was no evidence on which to base a finding of wilful, wanton, and reckless conduct, because it was not shown that the engineer knew the situation at the crossing in time to stop his train, and in spite of such knowledge, knowing the consequence if he failed to stop, ran on without making all reasonable effort to do so and avoid it, quoting as follows from *Denman* v. *Johnston*, 85 Mich. 396 (48 N. W. 565):

"The term 'gross negligence' has been used in cases decided by this court, and has a definite meaning, when referred to, as authorizing a recovery for a negligent injury notwithstanding the contributory negligence of the plaintiff. It means an intentional failure to perform a manifest duty in reckless disregard of the consequences as affecting the life or property of another. It also implies a thoughtless disregard of consequences, without the exertion of any effort to avoid them."

This definition has several times since been referred to and applied by this court. *Borschall* v. *Railway*, 115 Mich. 473 (73 N. W. 551); *Redson* v. *Railroad Co.*, 120 Mich. 671 (79 N. W. 939); *Labarge* v. *Railroad Co.*, 134 Mich. 139 (95 N. W. 1073); *Allworth* v. *Lighting Co.*, 142 Mich. 25 (105 N. W. 75); *Knickerbocker* v. *Railway Co.*, 167 Mich. 596 (133 N. W. 504); *Berry* v. *Railway Co.*, 173 Mich. 181 (138 N. W. 1038).

As a result of plaintiff's exertions and omissions, a dangerous, unlighted obstruction rested across defendant's track upon this dark night, imperiling, to him, but the property he had put there, while, to defendant, it jeopardized not only its property, but the safety

and lives of its passengers and employees. The evidence conclusively shows him guilty of serious negligence, while it falls short of tending to show that the motorman was guilty of any wilful, wanton, or gross negligence amounting to an intentional failure to perform a manifest duty in reckless disregard of the consequences to the life or property of others.

We find no occasion to disturb the judgment of the *nisi prius* court, and the same will stand affirmed.

STONE, C. J., and OSTRANDER, MOORE, and BROOKE, JJ., concurred with STEERE, J.

KUHN, J. I cannot agree that the defendant should be held to be free from negligence. In my opinion, the motorman should have stopped or slowed down upon seeing the light on the track and ascertained what the cause of the signal was. It should be so held in the interests of the traveling public. I agree, however, that the plaintiff was guilty of contributory negligence, and therefore concur in the result.

BIRD, J., concurred with KUHN, J. PERSON, J., did not sit.